| | | | |
|---|---|---|---|
| AO 91 (Rev. 11/11)  Criminal Complaint | AUSA: David Cowen<br>Special Agent: Joshua Loy | Telephone: (313) 226-9575<br>Telephone: (313) 202-3400 | |

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

United States of America
v.
Trevon PICKETT
Nishawn SANKEY
Anjahne WRIGHT

Case: 2:22−mj−30178
Assigned To : Unassigned
Assign. Date : 4/11/2022
CMP: SEALED MATTER (MAW)

### CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of **September 24, 2021** in the county of **Washtenaw** in the **Eastern** District of **Michigan**, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1951, 2 | Interference with interstate commerce by threats or violence, and aiding and abetting |

This criminal complaint is based on these facts:
SEE ATTACHED AFFIDAVIT

☑ Continued on the attached sheet.

_____
*Complainant's signature*
Special Agent Joshua Loy, ATF
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: April 11, 2022

_____
*Judge's signature*
Hon. Elizabeth A. Stafford, U.S. Magistrate Judge
*Printed name and title*

City and state: Detroit, Michigan

## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

I, Joshua Loy, being duly sworn, state the following:

### I. Introduction

1. I am employed as a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives (hereinafter "ATF"), and have been so employed since June 2018. I am currently assigned to the Detroit Field Division Ann Arbor Field Office. I am responsible for investigating violations of firearms laws, among other crimes. I graduated from the Federal Law Enforcement Training Center and the ATF Special Agent Basic Training Course.

2. This affidavit is based on my personal knowledge and observations, law enforcement reports, communications with others who have personal knowledge of the events and circumstances herein, and information gained through my training and experience.

3. This affidavit is in support of a criminal complaint and arrest warrants for Trevon PICKETT (xx/xx/2002), Nishawn SANKEY (xx/xx/2002), and Anjahne WRIGHT (xx/xx/2000), for interference with interstate commerce by threats or violence, aiding and abetting, in violation of 18 U.S.C. §§ 1951, 2. This affidavit is submitted for the limited purpose of establishing probable cause. I have not included each and every fact known to law enforcement related to this investigation.

## II. Summary of the Investigation

4. On September 24, 2021, at approximately 9:19 a.m., the Washtenaw County Sheriff's Office (WCSO) received an armed robbery call. The robbery had just occurred at Boost Mobile, a store located in Ypsilanti, Michigan, within the Eastern District of Michigan. Upon arrival, the perpetrators had already fled the scene.

5. The victim, the only employee working at the time of the robbery, reported that a female had entered the store. She asked multiple questions about phones, the store's inventory, and prices. The female did not buy anything or conduct any business. The victim found the female's behavior suspicious as she asked many more questions than the average customer, purchased nothing, and engaged in no other business. Moments after the female left, a male entered the location. The male approached the counter and asked the same questions as the female. The questions were so similar, the victim asked if the male was with the female who just left the store. Immediately thereafter, two additional males entered.

6. One of the men who entered approached the victim. The man held his hand against his waist. The victim saw the outline of what the victim believed was a firearm or some other weapon. The man, who wore a Covid-19 face mask, asked the victim where the money and the phones were located. He then ordered the victim to the ground and instructed the victim not to look at the men. One of the men stated, "let's just take him to the back."

7. The victim was told to move to the back of the store. Already on the ground, the victim crawled to the back. One of the men struck the victim multiple times with his fists and kicked him. The victim heard one of the men state "let's just tie him up." The victim then felt a rope wrapped around his neck. The rope was pulled tight. The victim lost his breath and was unable to breathe. One of the men told the victim, "you are gonna die today." When the victim tried to grab at the rope, he was knocked down, hit, and kicked again. Abruptly, one of the men directed the others to leave the location, and they all fled the store.

8. Several items were stolen. The robbers also stole the victim's personal backpack with his personal belongings. Officers found the white rope, with blood stains, on the floor. The victim had red marks around his neck, red marks on his face, he was bleeding from his ear, and his eyes were swollen.

9. While on scene, a witness approached the officers. The witness reported that there were four individuals who were around the area prior to the robbery. One was a male wearing all black, one was a male wearing a red hoodie, and one was a male wearing a grey hoodie. This matched the description of two of the men given by the victim. The victim also reported that all three men wore Covid masks and two of the men wore bright yellow gloves.

10. Immediately following the robbery, a K-9 track led officers from the Boost Mobile to 2930 International Drive apartment 220B. The 2930 International

Drive location, which is approximately 1,000 feet from the Boost Mobile, housed six separate apartments, including 220B. Apartment 220B was the residence of Anjahne WRIGHT. In recent days, the WCSO received several reports of armed robberies that were connected to this location.

11. An individual near the 2930 International location reported seeing several men running to that location right after the Boost Mobile robbery.

12. The WCSO sought a state search warrant for apartment 220B. The surrounding area was secured pending the issuance of the warrant. PICKETT and SANKEY were observed exiting 2930 International Drive. As they attempted to leave the area, law enforcement stopped them and asked for their identification. SANKEY truthfully provided his name, but PICKETT gave the deputies an alias. The deputies later learned PICKETT's true identity. Thereafter, they were released from the scene.

13. WCSO obtained and executed a state search warrant at apartment 220B. During a search of the apartment, WCSO also searched the apartment building's lower-level common area laundry room. Underneath an empty trash bag, in a trash can, were two backpacks and miscellaneous items, some of which appeared to be electronics. The trash cans were dumped, and the following items were recovered:

    a. One yellow training handgun that was the size and weight of a real handgun;

4

    b.    Eight masks (used to protect against the transmission of Covid-19);

    c.    Two pairs of bright yellow gloves;

    d.    One black glove;

    e.    A red hoodie (see paragraph 9);

    f.    Six cell phones, multiple Bluetooth devices, a portable mobile hotspot, and charging cables from the aforementioned Boost Mobile store; and

    g.    The victim's brown backpack with his passport, ID card, insurance card, miscellaneous paperwork, and other miscellaneous items.

14.    Following the state search warrant, Anjahne WRIGHT was interviewed. During the interview, WRIGHT made the following statements:

    a.    She did not know anything about the robbery;

    b.    That morning, she went to the Dollar Tree then Subway;

    c.    She entered the Dollar Tree with three males. One of the individuals was known to her as "Bigs" and the second was a juvenile (hereinafter M.S.). She did not know the name of the third man. She described the third man as someone who was quiet and normally wore a mask;

    d.    She next entered the Boost Mobile store to pay her bill. However, she decided it was not fully opened, that she could not pay her bill, and walked out;

    e.    She returned to her apartment; and

    f.    M.S. arrived at her apartment but said nothing about an armed robbery.

15. WRIGHT was provided a photo of SANKEY and positively identified SANKEY as "Bigs". She was also shown a picture of PICKETT. WRIGHT was unsure if PICKETT was the third person she was with at the Dollar Tree.

16. On October 27, 2021, SANKEY was arrested by the United States Marshals Service (USMS) on a state warrant for the Boost Mobile robbery. SANKEY was later advised of his Miranda Rights and agreed to answer questions. SANKEY made the following statements:

    a.    He participated in the robbery of the Boost Mobile; and

    b.    He was present with WRIGHT and PICKETT at the Dollar Tree prior to the robbery.

17. PICKETT was arrested by the USMS on October 27, 2021, on a state warrant related to the Boost Mobile robbery. PICKETT waived his Miranda Rights and agreed to answer questions. PICKETT made the following statements:

    a.    He was present at the Dollar Tree;

      b.      He denied knowing WRIGHT or SANKEY;

      c.      He did provide a false name to the police during the execution of the search warrant at WRIGHT's apartment; and

      d.      He had nothing to do with the robbery.

18. Law enforcement went to the above-mentioned Dollar Tree. The Dollar Tree was approximately 500 feet from the Boost Mobile. Surveillance footage and register receipts revealed that WRIGHT, SANKEY, M.S., and PICKETT purchased one fruit punch drink and two pairs of bright yellow safety gloves at approximately 8:59 a.m. on the day of the Boost Mobile robbery. They exited the store together. Approximately four minutes later, at 9:03 a.m., PICKETT reentered the store and purchased a white rope. Sixteen minutes later, at 9:19 a.m., the Boost Mobile was robbed.

19. DNA was taken from some of the items recovered from the lower level of 2930 International Drive. DNA lab analysis revealed the following:

      a.      There was very strong support that DNA recovered from inside a pair of the bright yellow gloves, purchased from the Dollar Tree and used in the robbery, belonged to PICKETT;

      b.      There was very strong support that PICKETT's DNA was on a black glove; and

7

      c.      There was very strong support that PICKETT's DNA was on a black Covid face mask.

20. WRIGHT was interviewed by law enforcement a second time. During the second interview, WRIGHT confirmed SANKEY was "Bigs" and that PICKETT was the third subject "involved".

21. Based on the investigation and my training and experience, the Boost Mobile store sells cellular phones and cellular phone accessories that are manufactured outside the State of Michigan. Therefore, the defendants' actions actually or potentially delayed, obstructed, or affected in any way or degree, interstate commerce or an item moving in interstate commerce.

### III. Conclusion

22. Probable cause exists that Nishawn SANKEY, Anjahne WRIGHT, and Trevon PICKETT did knowingly and intentionally interfere with interstate commerce by threats or acts of violence, and/or aid and abet in the interference with interstate commerce, in violation of 18 U.S.C. §§ 1951, 2.

23. As to Nishawn SANKEY, he confessed to robbing the Boost Mobile store.

24. As to Anjahne WRIGHT, probable cause exists that WRIGHT aided and abetted the robbery when she entered the store to survey the scene in preparation for the robbery:

    a.    She was with SANKEY and PICKETT at the Dollar Tree, approximately fifteen minutes before the robbery, when they purchased gloves and a rope used in the robbery;

    b.    She entered the store immediately before the robbery and asked suspicious questions to the victim. These were the same questions asked by SANKEY immediately before the robbery;

    c.    The robbers were tracked to her apartment building immediately after the robbery and an eyewitness observed several men running to her apartment building;

    d.    The items stolen from the Boost Mobile store were found in the lower level of her apartment building;

    e.    She lied to the police about going into the Boost Mobile store to pay her bill when, in fact, she never attempted to pay her bill or conduct any business with the victim; and

    f.    She lied about not knowing the identity of the "third man" (PICKETT) during her first interview.

25.    As to Trevon PICKETT:

    a.    PICKETT was with SANKEY and WRIGHT when they purchased bright yellow gloves fifteen minutes before the robbery. He later purchased a white rope;

    b.    The white rope was used to strangle the victim and the bright yellow gloves were worn by two of the robbers;

    c.    PICKETT was stopped as he exited WRIGHT's apartment building after the robbery. When confronted by law enforcement, he provided a fake name;

    d.    PICKETT's DNA was found in a pair of bright yellow gloves recovered in the lower level of WRIGHT's building. His DNA was also found on a separate black glove and a Covid mask recovered from the same location. These items were found alongside items stolen from the Boost Mobile store and hidden underneath a garbage bag in a garbage can.

26.    The Boost Mobile store was located in the Eastern District of Michigan.

Respectfully Submitted,

_____
Joshua Loy
Special Agent, ATF

Subscribed and sworn before me and/or by reliable electronic means
on April  11 , 2022

_____
Hon. Elizabeth A. Stafford
United States Magistrate Judge